# United States Court of Appeals
## For the First Circuit

---

No. 12-2438

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL R. THOMAS,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

---

Before

Lynch, Chief Judge,
Thompson and Kayatta, Circuit Judges.

---

J. Hilary Billings, Assistant Federal Defender, for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom Thomas E. Delahunty II, United States Attorney, was on brief, for appellee.

---

November 22, 2013

---

**LYNCH, <u>Chief Judge</u>**.  Michael R. Thomas conditionally pled guilty to a series of criminal charges brought in 2011, including for sending letters to public officials threatening murder.  He appeals from the district court's 2011 denial of his motion to suppress the fruits of the use of his 2005 DNA profile in securing a 2011 warrant.  <u>United States</u> v. <u>Thomas</u>, 815 F. Supp. 2d 384 (D. Me. 2011).

The DNA was obtained during a 2005 postal service investigation of a different matter which resulted in no charges against Thomas.  That profile was not destroyed but retained in closed investigative files.  It was retrieved during the 2011 investigation, which focused on Thomas for other reasons.  The 2005 DNA profile was a match to the DNA recovered from the threatening letters sent in 2011 and provided the basis for the 2011 warrant.

This case presents a series of Fourth Amendment issues relating to the collection of tissue by cheek swab and the resulting DNA profile, the retention of the profile in the closed case file of the 2004-2005 investigation, and later, the use of the profile in support of the warrant in the 2011 federal case.

The issue arises because the swab material was collected in 2005 by postal inspectors' service on Thomas of a grand jury subpoena, given by a clerk of court to a U.S. Attorney on request. There was no judicial or other grand jury involvement in issuance of the 2005 grand jury subpoena, and it was not issued in

-2-

conjunction with an arrest or a determination of probable cause or some lesser standard.  While we agree with Thomas that the method of obtaining his DNA, under Maryland v. King, 133 S. Ct. 1958 (2013), violated the Fourth Amendment, we affirm, under Herring v. United States, 555 U.S. 135 (2009), the district court's denial of Thomas's motion to suppress in 2011.

## I.

The undisputed underlying facts are as follows.

A.        The 2004-2005 Investigation

In 2004, a threatening letter in an envelope containing an unidentified white powder was mailed to Austin Preparatory School in Reading, Massachusetts.  The letter bore an "Eastern Maine 044" postmark, meaning that it was processed in Hampden, Maine, which processes all mail from northern Maine.  Odette Kent, a school secretary, opened the letter, and then reviewed the school's alumni database to determine how many alumni lived in the area associated with the "Eastern Maine 044" postmark on the letter.  After finding that Thomas[1] lived in the area of northern Maine associated with this postmark, Kent passed on his name to her husband, U.S. Postal Inspector William Kent.  When the school received a second threatening letter from the same postal area where Thomas lived, Michael Desrosiers, another Postal Inspector

---

[1] At the time, Thomas's name was Shawn P. Higgins, though he has since changed it to Michael Thomas.  We refer to him as "Thomas" throughout.

stationed in Portland, Maine, drafted a letter requesting a grand jury subpoena of Thomas from the U.S. Attorney's Office in Portland. The request was granted. The U.S. Attorney's Office, without consulting a federal grand jury, obtained a subpoena from a court on January 18, 2005. The subpoena, given to the postal inspectors, ordered Thomas either to appear before the grand jury sitting in Bangor, Maine on February 7, 2005, or to comply with the subpoena by providing a DNA sample, fingerprints, and a handwriting exemplar directly to the postal inspectors.

William Kent, Desrosiers's supervisor at the time, drove to Thomas's home in Madawaska, Maine on January 19, 2005 (about an eight-hour round trip drive from Bangor) to serve the subpoena. He gave Thomas the subpoena and told him that he could either make the round trip to Bangor to comply with the subpoena or provide the required materials at the local police station. Thomas chose the local option and provided the requisite samples, including a cheek swab for the DNA.[2] During this exchange, Thomas was not advised he

---

[2] The Supreme Court recently described the nature of the swab used to obtain a DNA sample:

> A buccal swab is a far more gentle process than a venipuncture to draw blood. It involves but a light touch on the inside of the cheek; and although it can be deemed a search within the body of the arrestee, it requires no "surgical intrusions beneath the skin." The fact that an intrusion is negligible is of central relevance to determining reasonableness, although it is still a search as the law defines that term.

Maryland v. King, 133 S. Ct. 1958, 1969 (2013) (quoting Winston v. Lee, 470 U.S. 753, 760 (1985)).

could refuse to comply with the subpoena.  The district court held that the record did not support a finding that Thomas was aware of his right to refuse to give the samples.[3]

Thomas's buccal swab was sent by the postal inspectors for analysis to Orchid Cellmark, Inc., a private company that provides testing services to government agencies.  While they were waiting for the results from Orchid Cellmark, the postal inspectors continued their investigation, and had an analyst in their forensic laboratory compare Thomas's handwriting exemplar to the handwriting on the Austin Prep letters.  Based in part on the analyst's belief that Thomas was the author of the letters, Kent and Desrosiers went to Thomas's home to interview him on June 22, 2005.  During that meeting, they informed him of the results of the handwriting analysis, but Thomas denied sending the letters.

In February 2006, Orchid Cellmark provided the DNA report and analysis to the U.S. Postal Inspection Service (USPIS) laboratory.  The results indicated that Thomas, on the basis of his DNA, could be <u>excluded</u> as the source of the DNA recovered from the stamps on the threatening letters to Austin Prep.  Attached to the report was Thomas's DNA profile, as depicted in tables listing the

---

[3] The government argued that Thomas's past criminal history and previous interactions with law enforcement indicated that his compliance with the subpoena was voluntary.  In 1998 he was convicted of making a false application on a firearms offense, and in 1999 he was convicted of stalking, an offense for which he served one year in prison.

genetic markers found at a number of different locations on the genetic material. The investigation into these letters was closed in June 2006, and Thomas was not charged with any crime. The evidence was never presented to a grand jury during this investigation.[4]

B.       The 2011 Investigation

In early 2011, the offices of Maine Governor Paul LePage and Wisconsin Governor Scott Walker began receiving anonymous, threatening letters. One letter to Governor LePage stated that the sender was "READY TO VOTE WITH A BULLET" and vowed to "STRIKE WHEN YOU LEAST EXPECT IT," while one of the letters sent to Walker stated that Walker "SHOULD BE SHOT DEAD" and that his "FAMILY SHOULD BE KILLED." Similarly threatening letters were also sent to Senator Joseph Lieberman and Congressman Steve King. Investigators were able to recover a DNA sample from at least one of the Governor LePage letters. The FBI contacted Desrosiers, who was still a Postal Inspector in Maine, for assistance in parsing the postmarks and other characteristics of the mailings.

On March 21, 2011, Desrosiers attended a meeting with another postal inspector and the two FBI Special Agents working on

---

[4] Indeed, had the DNA evidence been presented to a grand jury in 2004-2005, the exclusionary rule would not have precluded the use of the DNA swab in that context, even had there been a Fourth Amendment violation. United States v. Calandra, 414 U.S. 338, 349-53 (1974). Had the grand jury issued an indictment, we have no way of knowing whether additional process would have been followed to obtain DNA samples for use at trial.

the case.  The agents shared that their possible suspect's address was at Loring House on Brighton Avenue in Portland, Maine; they also focused on how to obtain the suspect's DNA without arousing his suspicion.  The mention of the Loring House address sparked Desrosiers's memory; he disclosed that in 2008, he had assisted in an FBI investigation in which Thomas was the target, and at that time Thomas resided at that address in Portland.  During the 2008 investigation, Desrosiers had pulled the then-archived case file from the Austin Prep investigation, and the March 21, 2011 meeting prompted him to review the original 2005 file once again.

The original investigation file included a "Destruction Certificate" which indicated that the original buccal swabs obtained in 2005 were destroyed, pursuant to the USPIS protocol for officially closing investigations.[5]  Desrosiers also discovered that a page of Thomas's DNA profile from the Orchid Cellmark report was missing from the file; after receiving permission to request the profile page from the USPIS lab, Desrosiers acquired the missing page of the report from Orchid Cellmark.  The Maine State Police Laboratory concluded that Thomas's DNA profile from the 2004-2005 investigation matched the DNA profile of the saliva found on three of the 2011 letters.  Apparently the investigators did not

---

[5] During the suppression hearing before the district court, Desrosiers explained that the DNA sample was destroyed pursuant to USPIS policy pertaining to certain physical evidence.  He was never asked about any policies governing the retention of investigative files.

have fingerprints from these letters to match against the fingerprints taken from Thomas earlier.

On March 24, 2011, the FBI obtained a criminal complaint, a warrant for Thomas's arrest, along with search warrants for Thomas's Portland, Maine apartment and another cheek swab. The warrant and complaint were obtained entirely on the basis of an affidavit from FBI Special Agent Pamela Flick. Flick's affidavit was based entirely on the match between the retrieved 2004-2005 DNA profile and the DNA profile taken from the 2011 threatening letters. Further, the 2011 Flick affidavit, written six years after the initial DNA swab was obtained, was the first time that the 2005 profile was presented to a federal magistrate. Thomas was arrested the next day.[6]

After his arrest, Thomas confessed to the 2011 crimes. He also confessed to having sent the threatening letters to Austin Prep. The disconnect between this confession and the findings of the 2005 DNA analysis could have been produced by Thomas simply having another person lick the stamps on those envelopes.

---

[6] Thomas entered a conditional plea of guilty to the following counts: two counts of threatening to murder members of Congress in violation of 18 U.S.C. §§ 115(a)(1)(B) and 115(b)(4), one count of mailing threatening communications in violation of 18 U.S.C. § 876(c), one count of possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and one count of internet stalking in violation of 18 U.S.C. § 2261A(2). The court sentenced him to 71 months' imprisonment; he is presently in prison. The suppression question is the only issue before us in this appeal.

C.          District Court Proceedings

In an order dated September 30, 2011, the district court denied Thomas's motion to suppress. The court found it unnecessary to decide whether the taking of the swab violated the Fourth Amendment. Thomas, 815 F. Supp. 2d at 388-89. It did conduct an evidentiary hearing and analyzed the law on issuance of grand jury subpoenas. Such subpoenas could clearly be used to obtain handwriting exemplars and fingerprints. United States v. Dionisio, 410 U.S. 1, 14-15 (1973); United States v. Mara, 410 U.S. 19, 21 (1973). But as to the issue of obtaining DNA by bodily intrusion, the lower courts were split as to what standard should be used to obtain such evidence by grand jury subpoena. The court found that it need not resolve whether Thomas consented to the search. The court also assumed that if there was a Fourth Amendment violation in the obtaining of the DNA in 2005, the exclusionary rule would have applied to a prosecution for the 2004 mailings.[7]

However, the court concluded that even if there were errors and inadequacies in the 2005 legal process that obtained the DNA profile, the exclusionary rule did not call for its exclusion in this new and unrelated 2011 charge for criminal conduct that occurred in 2011.

---

[7] The court rejected the arguments that a separate violation occurred when the postal inspectors obtained the missing page of the profile to complete their file in 2011 or when the information was retained.

Relying on <u>Herring</u> v. <u>United States</u>, <u>supra</u>, the court concluded that the exclusionary rule should not be applied because there was no flagrant or deliberate police misconduct at any point, and application of the exclusionary rule would have little deterrent value, given this absence. The costs of exclusion, the court reasoned, outweighed the benefits. <u>Thomas</u>, 815 F. Supp. 2d at 389.

## II.

A.    <u>Standard of Review</u>

In an appeal from the district court's denial of a motion to suppress, we review de novo the district court's conclusions of law. <u>United States</u> v. <u>Barnes</u>, 506 F.3d 58, 61-62 (1st Cir. 2007). We review findings of fact for clear error. <u>United States</u> v. <u>Infante</u>, 701 F.3d 386, 392 (1st Cir. 2012). The facts are largely agreed upon; we review de novo the legal conclusions drawn from them. The structure of our analysis follows those arguments presented on appeal and does not engage in issues not appealed by Thomas.

B.    <u>Exclusionary Rule</u>

Thomas seeks exclusion of all evidence derived from the taking, retention, disclosure, or use of the DNA sample or profile obtained in 2005. This includes the 2011 search and arrest warrants.

The Fourth Amendment cause requirement will bar the use of the exclusionary rule if there is no but-for causal connection between the Fourth Amendment violation and later discovery of evidence. Nardone v. United States, 308 U.S. 338, 341 (1939). The causation nexus has been met here. The government concedes that but for the use of the retained DNA profile, the police would not have been able to supply probable cause to search Thomas's home, arrest him, or obtain a new DNA sample from him in 2011.

That concession does not dictate the result of our exclusionary rule analysis. Hudson v. Michigan, 547 U.S. 586, 592 (2006) ("Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression."); see also United States v. Diehl, 276 F.3d 32, 44-45 (1st Cir. 2002) (declining to apply the exclusionary rule in the absence of police misconduct even where the "critical piece of evidence for the search warrant" was obtained via a Fourth Amendment violation).

The exclusionary rule is "designed to safeguard Fourth Amendment rights generally through its deterrent effect." United States v. Calandra, 414 U.S. 338, 348 (1974); see Davis v. United States, 131 S. Ct. 2419, 2426 (2011) ("The [exclusionary] rule's sole purpose . . . is to deter future Fourth Amendment violations." (emphasis added)). Exclusion is not an automatic consequence of a Fourth Amendment violation, but rather is available only where the benefits of deterring the police misconduct that produced the

-11-

violation outweigh the costs of excluding relevant evidence. _Herring_, 555 U.S. at 141.

Importantly, in _Herring_, a case involving a negligent mistake, the Court held:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. . . . [T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

555 U.S. at 144.[8]  There is no serious argument presented that _Herring_'s deterrence-based analytical standards are limited to cases of error produced by negligence, and we apply those standards here.

Significantly for our purposes, the _Herring_ criteria also include consideration of whether the police error is "attenuated" from the events that occur following the error.  "Attenuation" is presented by _Herring_ as a necessary component of its deterrence analysis.  Where an error "arises from nonrecurring and attenuated negligence," the Court held, it is "far removed from the core concerns that led us to adopt the [exclusionary] rule in the first place," and because the resulting deterrent value is necessarily minimal, exclusion is not warranted.  555 U.S. at 144.

---

[8] This case does not involve any claim of systemic negligence, record-keeping errors, or government use of false information. _Cf._ _Herring_, 555 U.S. at 145-46.

Thomas mounts Fourth Amendment attacks on the police conduct at every stage: the original conduct in obtaining the swab, the retention of the DNA profile material in the closed case file of the 2004-2005 investigation (including the obtaining a replacement copy from Orchid Cellmark in 2011), and the transmission of the material to investigators in 2011.

### 1.    2004-2005 Postal Inspector Conduct

The Supreme Court has recently held that the <u>taking</u> of a DNA sample from an arrestee using a buccal swab on the inside of a person's cheek is a search.  <u>Maryland</u> v. <u>King</u>, 133 S. Ct. 1958, 1968-69 (2013).  Certain consequences follow from the holding that is a search.  We agree with Thomas that the obtaining of the buccal swab is a violation of the Fourth Amendment on the facts of this case.  That is because since this was a search, under present law the mere use of a grand jury form, without any judicial or even grand jury involvement and no determination of the basis for such an intrusion, is inadequate.  We bypass the issue of whether Thomas, to assert the claim, was required to object to the subpoena or seek a hearing to that effect at the time, and assume he is free to present the claim now.[9]

---

[9] Thomas never challenged the grand jury subpoena either before or after his compliance with it in 2005.  The government further contends that even assuming the taking of the DNA sample pursuant to the grand jury subpoena was a search, Thomas consented to it.  <u>See</u> <u>Vale</u> v. <u>Louisiana</u>, 399 U.S. 30, 35 (1970) (no Fourth Amendment violation where a search is authorized by consent).  But as the district court stated, the passage of time also makes it

-13-

Though grand jury proceedings are entitled to a "presumption of regularity," In re Lopreato, 511 F.2d 1150, 1152 (1st Cir. 1975), the grand jury is also "without power to invade a legitimate privacy interest protected by the Fourth Amendment," Calandra, 414 U.S. at 346. In order to decide whether Thomas's rights were violated here, we do not need to decide under what Fourth Amendment standard a grand jury may obtain a DNA sample through intrusive personal samples by investigative means.

More generally, the Supreme Court has said that the standard governing grand jury subpoenas is something less than probable cause, reasoning that "the Government cannot be required to justify the issuance of a grand jury subpoena by presenting evidence sufficient to establish probable cause because the very purpose of requesting the information is to ascertain whether probable cause exists." United States v. R. Enters., Inc., 498 U.S. 292, 297 (1991). Of course, there is a qualitative difference between the documents compelled by the subpoena in R. Enterprises and the DNA sample compelled here; R. Enterprises involved the production of documents in which the company did not have a Fourth

_____

more difficult to assess whether Thomas voluntarily consented to give the DNA sample when he complied with the subpoena. Whether an individual consented to a search is "a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). The prosecution bears the burden of proof on this inquiry. Id. at 222. While we do not resolve the issue, we assume, in Thomas's favor, he did not consent.

Amendment interest. What is clear here is that there was no determination by a grand jury or a judge of whether any particular level of Fourth Amendment justification had been met to justify the grand jury subpoena for the DNA sample. On that basis alone, we conclude his Fourth Amendment rights were then violated.

Our issue, though, is not whether Thomas's rights were violated, but whether the Herring test for application of the exclusionary rule has been satisfied. The district court's determination, after a hearing and supported by the evidence, found that the police conduct "was not flagrant or deliberate" within the meaning of Herring. Thomas, 815 F. Supp. 2d at 38. There is no evidence here that the postal inspectors involved in obtaining and executing the subpoena knowingly engaged in any misconduct.[10] William Kent testified during the suppression hearing that he recalled other investigators requesting DNA samples by use of grand jury subpoenas before the Austin Prep investigation, and that those requests had produced useful information. Kent's testimony was that while requesting a DNA sample in a grand jury subpoena may not

---

[10] There has been an "established practice" of allowing the U.S. Attorney to issue subpoenas in order to secure and bring evidence before a grand jury. In re Lopreato, 511 F.2d at 1153; see also In re Grand Jury Matters, 751 F.2d 13, 16 (1st Cir. 1984) ("Although grand jury subpoenas are issued in the name of the district court, they are issued pro forma and in blank to anyone requesting them without prior court approval or control."). When Desrosiers requested a grand jury subpoena from the U.S. Attorney's Office in Maine, at least for fingerprint data, he was acting within the scope of normal law enforcement conduct.

have been everyday practice, it was not considered an illegal action at the time.[11]

Thomas argues that applying the exclusionary rule in this 2011 case would deter any future use of mere forms for grand jury subpoenas obtained by the U.S. Attorney's Office to obtain DNA swabs. If that practice as to grand juries has continued (and we do not know if it has), exclusion arguably could deter such conduct as to grand jury practice. Even so, the Supreme Court has said that would not justify exclusion at the grand jury level. Calandra, 414 U.S. at 349-53.

The deterrence question here is different. Turning, as we must under Herring, to the attenuation and larger deterrence questions, there is a major attenuation problem with his deterrence argument. Had there been a prosecution resulting from the 2004-2005 investigation which used that DNA sample, we agree that there would have been some deterrence value in excluding such evidence if it then had been obtained by nothing more than use of a subpoena form. No such prosecution ultimately occurred, so the issue of possible violation of Thomas's rights never came up. And he never sought destruction of the data.

---

[11] In 2005, neither our circuit nor the Supreme Court had spoken decisively on the Fourth Amendment implications of a cheek swab like the one used here. The Supreme Court characterized the process of "using a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples" as a search for the first time in 2013. King, 133 S. Ct. at 1968-69.

It is difficult to see why suppression in this later and unforeseen prosecution of an offense not yet committed at the time of the search would have acted to deter the law enforcement agents in the 2011 case from acting improperly any more than they would have already been deterred by knowledge that the results of the search would likely have been excluded at trial of the offense being investigated.

Thomas's hypothesized deterrent effect is simply too attenuated to justify applying the exclusionary rule under Herring. The underlying conduct that violated the Fourth Amendment took place six or seven years ago, and the connection between the 2005 investigation and the 2011 letters was largely a result of happenstance. First, the connection turned on the Loring House address, which Desrosiers happened to remember from a 2008 investigation, not the 2005 investigation, during the 2011 meeting with FBI agents. Second, it was happenstance that it was Desrosiers who was involved in both the 2005 and 2011 investigations.

The circumstances surrounding the issuance and service of this subpoena and the subpoena's attenuated relationship to the 2011 investigation plainly do not justify exclusion under Herring.

2.    Retention of the DNA Report

Thomas separately contends that the district court erred in concluding that there was also no wrongdoing inherent in the

-17-

unobjected-to retention of the DNA profile after the 2004-2005 investigation was closed.  He so concludes, based largely on the fact no charges were brought against him from that investigation.  We disagree with his conclusion.  Even were we to assume he held some Fourth Amendment interest in the non-retention of the data, it would still be insufficient to warrant exclusion.

First, the buccal swab sample itself was destroyed in 2006, leaving only one page of the two-page DNA profile in Thomas's file.[12]  That DNA profile, which is comprised of 13 loci taken from the "non-protein coding junk regions of DNA," is useful only for identification purposes.  King, 133 S. Ct. at 1968.  Thomas's DNA sample could not have been used to discern anything other than his identity.[13]  That is because such "junk DNA," "while useful and even dispositive for purposes like identity, does not show more far-reaching and complex characteristics like genetic traits."  Id. at 1967.

---

[12] As a result of a 2005 clerical error, the DNA report that Orchid Cellmark originally sent to the postal inspectors was missing one of the pages of Thomas's DNA profile.  Once it became clear to Desrosiers and others in 2011 that their file was incomplete, Desrosiers contacted Orchid Cellmark to request the complete profile.  Orchid Cellmark fulfilled that request in late March 2011.

[13] We do not reach hypothetical concerns not presented by this case.  Accord United States v. Weikert, 504 F.3d 1, 13 (1st Cir. 2007) (while the possibility that junk DNA may someday be used to discern traits beyond a person's identity could eventually change the privacy implications of collecting a DNA sample, that hypothetical concern does not change Fourth Amendment analysis under present conditions).

Second, it is true that "fingerprints and other personal records are routinely maintained in law enforcement files once taken," United States v. Weikert, 504 F.3d 1, 16 (1st Cir. 2007) (quoting United States v. Kincade, 379 F.3d 813, 842 n.3 (9th Cir. 2004)) (internal quotation marks omitted), and on the facts of this case it is plain that the report on Thomas's DNA profile was retained (and later used) in much the same fashion as a fingerprint exemplar. And the retention of that profile in these circumstances violated no statute, thus giving rise to no claims of even departure from statutory norms.

In support of his argument that his rights were violated by the government's retention of his DNA profile, Thomas argues, incorrectly, that the police circumvented and undermined the DNA Analysis Backlog Elimination Act of 2000 ("DNA Act"), Pub. L. No. 106-546, 114 Stat. 2726 (2000) (codified as amended in scattered sections of 10 U.S.C., 18 U.S.C., 28 U.S.C. and 42 U.S.C.). This, he says, was misconduct.

By its terms the DNA Act does not apply here.[14] The Act governs the collection and retention of DNA samples of individuals who have been convicted of "a qualifying Federal offense," and who

_____

[14] Thomas argues that suppression is warranted here in part because exclusion could "deter police avoidance of the DNA Act." This argument is clearly without merit. As we explain, it is plain that none of the activity in this case came within the ambit of the Act, and we reject Thomas's assertion that the postal inspectors were somehow "avoiding" a statute to which they simply were not subject.

are incarcerated or on parole, probation, or supervised release. 42 U.S.C. § 14135a(a)(1)(B), (a)(2). Once a DNA sample is collected under the Act, the FBI uses the sample to create a unique DNA profile, which is entered into the Combined DNA Index System (CODIS), a centralized database that includes profiles of state and federal offenders, as well as forensic profiles obtained from crime scene evidence.[15] Boroian v. Mueller, 616 F.3d 60, 63 (1st Cir. 2010). Because Thomas was not charged with nor convicted of a qualifying offense in 2005, his DNA sample was neither collected nor retained pursuant to the DNA Act. On a plain text reading of the statute, the Act's requirements, including its expungement provisions,[16] do not apply to Thomas, as his DNA profile was never entered into CODIS in the first place.

_____

[15] CODIS is a highly valuable investigative tool for law enforcement, as it permits "state and local forensic laboratories to exchange and compare DNA profiles electronically in an attempt to link evidence from crime scenes for which there are no suspects to DNA samples of convicted offenders on file in the system." Boroian v. Mueller, 616 F.3d 60, 66 (1st Cir. 2010) (quoting H.R. Rep. No. 106-900, pt. 1, at 27 (2000)) (internal quotation marks omitted); see also King, 133 S. Ct. at 1968 ("In short, CODIS sets uniform national standards for DNA matching and then facilitates connections between local law enforcement agencies who can share more specific information about matched [DNA] profiles.").

[16] The DNA Act's expungement provisions require the FBI to "promptly expunge from the [CODIS] index . . . the DNA analysis of a person included in the index" who, per a court order, has been acquitted, has had charges dismissed, or has had his or her qualifying conviction overturned. 42 U.S.C. § 14132(d)(1) (emphases added). The statute is silent on the question of expungement from individual police investigation files.

In Weikert, we noted that the combination of a blood draw, the creation of the DNA profile, and the entry of a DNA profile into CODIS implicates an individual's privacy interests. 504 F.3d at 12. But because a CODIS profile "simply functions as an additional, albeit more technologically advanced, means of identification," we later held in Boroian that "the government's retention and matching of [an individual]'s profile against other profiles in CODIS does not violate an expectation of privacy that society is prepared to recognize as reasonable, and thus does not constitute a separate search under the Fourth Amendment." 616 F.3d at 67-68 (emphasis added). This dismantles Thomas's argument that the retention and matching of his data here was a separate search within the meaning of the Fourth Amendment.

Because the DNA Act by its terms applies only to DNA samples taken from individuals already convicted of "qualifying" crimes, individuals subject to the DNA Act have a "substantially diminished expectation of privacy." Weikert, 504 F.3d at 11 (discussing the privacy expectations of individuals on conditional release following a qualifying conviction). Thomas relies on this concept from Weikert.

Thomas's argument ignores the distinguishing facts that his DNA data was not in CODIS or any other database and was retained only in an old closed case file on an investigation (and not even on him individually). His argument also sidesteps the

fact that the old file was not easily or widely available to police, and that there was no disclosure except to relevant law enforcement officials. Thomas points to Weikert as supporting his argument that the retention of his data invades his reasonable expectation of privacy. And it does so, he argues, even more strongly for him than for the convicted prisoners. The police needed to focus on Thomas first to find the DNA, not vice versa as is the case with a database.

We think there is a difference between the situation in Weikert[17] discussing the CODIS database, which is widely available and used, and the retention of an individual suspect's DNA data in an old investigatory file about an unrelated crime. We are unwilling to make the leap Thomas urges as to whether society would view him as having a reasonable expectation of privacy preventing later disclosure of the retained profile to other relevant investigatory law enforcement personnel.[18] We need not decide the issue of whether retention of DNA profile data--in the file of an investigation which does not result in charges in other

---

[17] Weikert in fact assumes that use by law enforcement of CODIS DNA profiles does not violate the Fourth Amendment and the mere possibility of unauthorized abuse, in violation of the DNA Act, "does not significantly increase Weikert's privacy interest." 504 F.3d at 12. Here, there is no claim the use was "unauthorized."

[18] We do agree with Judge Easterbrook's observation in Green v. Berge, that "what is 'reasonable' under the Fourth Amendment for a person on conditional release, or a felon, may be unreasonable for the general population." 354 F.3d 675, 680 (7th Cir. 2004) (Easterbrook, J., concurring).

circumstances--endangers a person's reasonable expectation of privacy protected by the Fourth Amendment. That is not the question before us. Even if we assume there is such an interest, the question is whether to apply the exclusionary rule to the retention of this data. But there was no misconduct in retention of the report, and so nothing to deter.

C.      Miscellaneous Arguments Regarding the Transfer of the DNA Profile Across Law Enforcement Agencies

Thomas mounts an additional set of arguments regarding the transmission of his DNA profile in 2011. First, he contends that it was improper for Desrosiers to obtain the missing page of the DNA profile simply by calling Orchid Cellmark, and that without a separate warrant, this was an impermissible violation of Thomas's reasonable expectation of privacy. Here, he cites the government's concession that individuals do not lose a reasonable expectation of privacy in their lawfully obtained DNA profile as to "any" subsequent use of it. See Boroian, 616 F.3d at 68; Weikert, 504 F.3d at 12-13.

We do not decide the broader questions raised by the government's concession. However, on these facts, the "subsequent use" of the DNA profile--completing an investigative file where the retention of the file itself was not improper--was not a separate violation of Thomas's Fourth Amendment rights.[19] We agree with the

---

[19] In this context, Thomas also reiterates his statutory argument: he disputes the government's assertion that DNA profiles

district court that the "Postal Service was entitled to that page from the outset, and no separate legal event . . . occurred by virtue of its completing its file."

Second, Thomas claims that because the DNA sample was initially collected "through a Grand Jury Process," the disclosures (first to Desrosiers by Orchid Cellmark and later to the Maine State Police) of the DNA profile violated the rules governing grand jury secrecy.

Desrosiers did not violate Rule 6(e) of the Federal Rules of Criminal Procedure when he gave the DNA profile to the Maine State Police for comparison purposes. First, Thomas fails to establish that Rule 6(e)--which governs grand jury secrecy--was implicated when the report was forwarded. Rule 6(e) imposes secrecy requirements regarding any "matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2)(B). Thomas does not provide any support for the proposition that this evidence, which was never presented to a grand jury, was subject to the restrictions of Rule 6(e). See, e.g., United States v. Phillips, 843 F.2d 438, 441

---

function similarly to fingerprints, and notes that once fingerprints are secured by law enforcement, "there are no statutory provisions requiring their expungement." That is an accurate characterization of the law's treatment of fingerprint exemplars; however, Thomas is incorrect to imply that there is a statute requiring the expungement of the DNA profile here. The DNA Act did not apply to the events of this case, and plainly that statute's expungement provisions do not reach beyond CODIS to individual police files whose contents are not governed by the Act in the first place. See 42 U.S.C. § 14132(d)(1).

(11th Cir. 1988) (holding that evidence not presented to the grand jury does not implicate its secrecy rules).

In any event, outside of severe cases, the authorized remedy for a secrecy violation is contempt, and not suppression of evidence.  See Fed. R. Crim. P. 6(e)(7) ("A knowing violation of Rule 6 . . . may be punished as a contempt of court.").  We have held that this remedy "focuses, as it should, 'on the culpable individual rather than granting a windfall to the unprejudiced defendant.'"  In re United States, 441 F.3d 44, 60 (1st Cir. 2006) (quoting Bank of Nova Scotia v. United States, 487 U.S. 250, 263 (1988)).  Even if we were to find that there was a violation of Rule 6 here, Thomas does not offer any evidence or cite any authority that would require exclusion, a remedy well beyond the one prescribed in Rule 6(e).

D.      Cumulative Analysis

Under Herring we also consider the costs to society from application of the exclusionary rule, and whether any marginal deterrence value outweighs the social costs.  555 U.S. at 141; United States v. Leon, 468 U.S. 897, 910 (1984).  Having found the Fourth Amendment violated in the taking of the 2004 sample, even assuming the retention of the DNA profile in a closed case file raises some privacy concerns, and that there is some marginal value even in attenuated deterrence, we agree with the district court

-25-

that exclusion is not "worth the price paid by the justice system." Herring, 555 U.S. at 144.

The experienced district court judge pointed out one such cost: "it will be very cumbersome if the use of items in law enforcement files can be challenged years later, in a different investigation. How is a current investigator to know the circumstances of the original acquisition and therefore whether particular items of evidence can be used?" Further, as we commented in Weikert, the use of DNA profiles has both the capacity to solve crimes efficiently, and to "exonerate those wrongfully suspected of criminal activity." 504 F.3d at 14.

We are confident that application of the exclusionary rule would be outweighed by the resulting costs to the criminal justice system. We affirm the district court's denial of Thomas's motion to suppress.

III.

We affirm.