Macdonald, D. Lloyd, J.
Before the Court is the defendants’ joint motion to suppress cell site location information (CSLI) obtained by the Commonwealth pursuant to an order issued by a judge of this Court pursuant to the federal Stored Communications Act, 18 U.S.C. §2703(d) (the “SCA”). The defendants submit that Commonwealth v. Augustine, 467 Mass. 230 (2014), requires that any such information be obtained via a warrant on a finding of probable cause. The defendants further move that the Court suppress all subsequently issued Blood and conventional search warrants because they were fruits of the poisonous tree. The latter warrants include search warrants issued post -Augustine to AT&T and T-Mobile which secured another copy of the CSLI originally obtained through the SCA order.
The Court DENIES the motion on various alternative grounds. First, the SCA order did not violate the defendants’ Article 14 reasonable expectation of privacy because it covered less than a four-day period, narrowly circumscribed around the commission of the crime and the period immediately before it. Further, the seizure was reasonable when considered in light of the totality of the circumstances.
Even if the original seizure of records did not meet current Article 14 standards required by Augustine, the subsequent warrants were based on evidence independent of the information obtained pursuant to the SCA order. Thus, any illegality was immaterial to the subsequent warrants.
Finally, the exclusionary rule is inappropriate to apply here, in any event, because the prosecutor and *451 the State Trooper who obtained the SCA order did so in reasonable reliance on established federal and state precedent and because there would be no deterrent purpose served by excluding the evidence. Deterrence of law enforcement misconduct and protection of the integrity of the judicial process are the core reasons underlying the exclusionary rule.
Setting
The case arises from a homicide that occurred in the early morning of June 23, 2010 in Attleboro. Just after 5 a.m. the -victim, Dylan Adams (“Adams”) and his girlfriend, Crystal Salmons (“Salmons”), were resting in their apartment when there was a sudden loss of power. When Salmons went downstairs to investigate, three masked men, one armed with a crowbar, burst through the door. In short order, Salmons was beaten with the crowbar, handcuffed, bound to a chair and bitten by one of the assailants. Adams was more severely beaten, then shot from above through the shoulder, lungs and diaphragm. When the police arrived after Salmons was able to make a 911 call, Adams was found dead in the bathroom. Following the beatings and the shooting, the assailants ransacked the house, stealing money and marijuana and threatened to shoot Salmons if she moved.
Because of the masks, Salmons was unable to identify any of the assailants other than to observe that two were black and one was white. She also noticed certain generic clothing, including blue jeans and black Nike sneakers worn by certain of the assailants.
Investigation Preceding the SCA Order
Adams was known to the police as a major marijuana distributor in the Attleboro area. In short order, the police theorized that the home invasion had been a rip-off orchestrated by competitor drug dealers. In the weeks after the homicide, the police developed information from several cooperating witnesses that confirmed their suspicions.
As recounted in the affidavits filed in support of the application for the SCA order, one such witness (later identified as Ryan Ilkowitz (“Ilkowitz”)) was in a car in Attleboro with a certain Hans Johnson (“Johnson”) on either June 20th or 21st, i.e., one or two days prior to the homicide. The police knew Johnson to be another significant marijuana dealer in the area. Ilkowitz described that while driving with Johnson in near proximity of the victim, Adams’s, home, Johnson related to him that he saw Adams in a car traveling behind them. In Ilkowitz’s presence, Johnson then made a cell phone call to a person Johnson identified as “Jose.” During the phone call, Johnson talked about a plan to rob Adams. Through other sources, the police identified “Jose” as the defendant Jose Polanco (“Polanco”).
In following up with various cell phone companies on telephone numbers associated with Adams, Johnson and Polanco, the investigators determined from conventional telephone billing records that in the period between June 20, 2010 through the time of the homicide on the morning of June 23rd there had been numerous calls between Johnson’s cellphone and a cell phone registered to an Ebonie Johnson, who also used the last name of Polanco.
It was on the basis of the above information that the police sought the SCA order to obtain the CSLI data that would confirm or contradict the cooperating witnesses’ accounts as to the location of the then-principal suspects in the homicide, Johnson and Polanco.
Discussion
Preliminarily, the Court finds that the defendants have standing to bring the subject motion. While Ebonie Johnson was the owner of record of the phone most at issue, the evidence is that both defendants had access to and allegedly used the phone, with her permission, as if it were their own. Commonwealth v. Amendola, 406 Mass. 592, 597 (1990).
The defendants do not dispute that the affidavits of the Assistant District Attorney and the State Trooper submitted to the Superior Court judge in connection with the SCA order established the requisite reasonable suspicion standard of the SCA.[1] Similarly, the Commonwealth does not take issue with the defendants’ proposition that such affidavits did not establish probable cause sufficient for the judge to have issued a search warrant. Thus, the papers were sufficient under the SCA but allegedly deficient for Article 14 purposes.[2]
The seizure was reasonable because limited in duration
In Augustine the SJC noted that “a number of courts — including this court — have determined that it is only when such [electronic] tracking takes place over extended periods of time that the cumulative nature of the information collected implicates a privacy interest on the part of the individual who is the target of the tracking.” 467 Mass. at 253, citing, inter alia, U.S. v. Jones, 132 S.Ct 945, 955 (2012), and Commonwealth v. Rouseau, 465 Mass. 372, 382 (2013). The SJC further noted, ‘This rationale has been extended in the context of CSLI." 467 Mass. at 253. And the Augustine court concluded, “[I]t is likely that the duration of the period for which historical CSLI is sought will be a relevant consideration in the reasonable expectation of privacy calculus.” Id. at 254.
Here, the duration of the CSLI period was less than four days, and the period was narrowly circumscribed to include only such days as the investigators had material information with regard to the immediate planning of the home invasion that led to the homicide, the homicide itself and its immediate aftermath. Clearly, what drove the SJC’s conclusion that the 20-day period of the Augustine order directly impacted the defendant’s privacy was the magnitude of the unfocused intrusion of such monitoring so as to be *452 able to reconstruct substantially the most private aspects of the defendant’s life. 467 Mass. at 247-49.
That is not the situation in this case. The period for which CSLI was obtained arose directly from credible and highly material information in the hands of the investigators that related to the planning and execution of the home invasion and the assailants’ flight from the scene.
“Reasonableness [is] the ‘touchstone’ ” of Article 14 and the Fourth Amendment. Commonwealth v. Roland R., 448 Mass. 278, 281 (2007), quoting Commonwealth v. Gaynor, 443 Mass. 245, 256 (2005). The contours of reasonableness are drawn by a consideration of the nature of the intrusion into the privacy interest at play, Commonwealth v. Feyenord 445 Mass. 72, 86 (2005), and the nature off the law enforcement interest at stake.
The relationship between the time-limited intrusion into the defendants’ privacy and the strength of the evidence as to the offense under investigation were proportional and, thus, reasonable under Article 14. See Commonwealth v. Willis, 415 Mass. 814, 819-20 (1993), and Commonwealth v. Rosado, 84 Mass.App.Ct. 208, 216 (2013).
The exclusionary rule does not apply in these circumstances
Even if the seizure of the CSLI at issue were to be determined to have been unlawful because not conducted pursuant to a warrant, the evidence should not be suppressed because none of the reasons underlying the rationale of the exclusionary rule are present.
The Augustine court acknowledged that “neither the statute, 18 U.S.C. §2703(d), nor our cases, have previously suggested that police must obtain a search warrant in addition to a §2703(d) order before obtaining an individual’s CSLI from his or her cellular service provider.” 467 Mass. at 257. There is no credible dispute that the prosecutor and trooper who sought (and the judge who issued) the SCA order were all proceeding upon a firmly-grounded understanding of the controlling legal standards when the SCA order was obtained in 2010.
“[A]s a general rule, the mere fact that an unlawful search and seizure has occurred should not automatically result in the exclusion of any illegally seized evidence.” Commonwealth v. Gomes, 408 Mass. 43, 46 (1990) (Greaney, J.). “[T]he foundation of the exclusionary rule [is the] interest in deterring unlawful police conduct.” Commonwealth v. Wilkerson, 436 Mass 137, 142 (2002). “[Wjhere ‘the exclusionary rule does not result in appreciable deterrence, then clearly, its use ... is unwarranted,’ ” id., quoting U.S. v. Janis, 428 U.S. 433, 454 (1976).
The remedy of exclusion of evidence obtained in violation of art. 14 is one of recent rather than ancient origin. See Commonwealth v. Upton, 394 Mass. 363, 364 (1985). One of the purposes justifying its application is the deterrence of police conduct that unlawfully intrudes on the rights of privacy and security guaranteed our citizens under art. 14, through the preclusion of the fruits of that conduct. Another is the protection of judicial integrity through the dissociation of the courts from unlawful conduct. See Commonwealth v. Ford, 394 Mass. 421, 433, (1985) (Lynch; J., dissenting); Commonwealth v. Lett, 393 Mass. 141, 145 (1984) (discussing purposes of exclusionary rule under Fourth Amendment to United States Constitution). Where those purposes are not furthered, rigid adherence to a rule of exclusion can only frustrate the public interest in the admission of evidence of criminal activity.
Commonwealth v. Brown, 456 Mass. 708, 715 (2010) (Cordy, J.).
The “exception[s] [to the strict application of the exclusionary rule are] justified when the deterrence rationale is outweighed by the competing societal interest in convicting the guiliy.” Commonwealth v. Benoit, 382 Mass. 210, 216 (1981) (Liacos, C.J.).
In this respect, while the SJC has not adopted the federal good faith exception to the exclusionary rule, Commonwealth v. Beldotti, 409 Mass. 553, 559 (1991), the SJC has “focus[ed] instead on whether the violations are substantial and prejudicial.” Commonwealth v. Hernandez, 456 Mass. 528, 533 (2010).[3] Nevertheless, good faith by the Commonwealth’s agents logically is pertinent to whether a violation was substantial. Here, the investigators’ good faith in seeking the SCA order and in relying on what they (and the judge issuing the order) reasonably understood was supportive appellate authority at the time directly affects the nature of whatever violation occurred and the alleged prejudice caused.[4]
Because the SCA order was sought and issued on an informed understanding of state constitutional principles in place in 2010 and because there is no suggestion of misconduct by any agent of the Commonwealth, the suppression of the evidence obtained pursuant to the order would disserve the enduring deterrent rationale of the exclusionary rule. Accordingly, even if obtained in violation of Article 14, the CSLI at issue is admissible.
If the exclusionary rule does apply, it bars only the CSLI secured pursuant to the original order
The Court reviewed the affidavits filed in connection with all subsequent requests for Blood and conventional search warrants, including the February 25, 2014 warrant directed to AT&T and T-Mobile for duplicate copies of the CSLI at issue. It is apparent that the probable cause underlying each warrant was based on evidence independent of the limited CSLI that was secured through the SCA order. ‘The relevant question, therefore, is whether the Commonwealth has demonstrated that the ‘improper official conduct was not a sine qua non or ’’but for" cause of the discovery’ of the [items at issue]. Commonwealth v. Benoit, 382 Mass. 210, 216 (1981)." Commonwealth v. *453 Webster, 75 Mass.App.Ct. 247, 255 (2009) (McHugh, J.). The Commonwealth has made that demonstration. Accordingly, there are no fruits of the poisonous tree to be suppressed.
ORDER
The defendants’ joint motion to suppress is DENIED.

The SCA provides: “A court order for disclosure . . . may be issued by any court that is a court of competent jurisdiction and shall issue only if the governmental entity offers specific and articulable facts showing there are reasonable grounds to believe that the . . . records or other information sought, are relevant and material to an ongoing criminal investigation.”

The Commonwealth argues, however, that at the time the SCA order was issued, it had in hand reliable information that would have readily constituted probable cause. The information was not inserted in the SCA application, the Commonwealth states, because it was not needed under the standards which the Commonwealth submits it reasonably believed were applicable at the time. The Commonwealth asks the Court — in the unique circumstances of the seismic shift in Article 14 jurisprudence occasioned by Augustine — to permit the Court to consider such evidence on a post hoc basis. Without rejecting the proposition, the Court prefers to rest its decision on other grounds.

The Hernandez court reaffirmed the deterrence rationale of the exclusionary rule: “[Ejxclusion is a deterrent to the abuse of official power based on the application of State legal principles.” 456 Mass. at 532.

Although not binding, of course, on an Article 14 issue, the doctrinal basis of federal Fourth Amendment law is appropriate to take into account. In this respect, a recent opinion by Chief Justice Sandra Lynch of the First Circuit is pertinent:
“[Tjhe Fourth Amendment ‘has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons.’ ” United States v. Leon, (1984) (quoting Stone v. Powell, 428 U.S. 465, 486 (1976). Even assuming the evidence was seized in violation of the Fourth Amendment, the evidence will be suppressed only when the police conduct is “sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.” U.S. v. Herring, 555 U.S. 135, 144 (2009); see also United States v. Thomas, 736 F.3d 54, 59-66 (1st Cir.2013) (discussing Herring's application of exclusionary rule and applying Herring to suppression claims based on alleged police misconduct).
U.S. v. Echevarria-Rios,_F.3rd _, 2014 Westlaw 1236440, p. 3-4 (C.A. 1 Puerto Rico) (March 26, 2014).