*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CF-1351

SHEPARDSON R. BLAIR, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-18057-11)

(Hon. Thomas J. Motley, Motion Judge)
(Hon. Ronna Lee Beck, Trial Judge)

(Argued April 9, 2014                    Decided May 7, 2015)

*Daniel Gonen*, Public Defender Service, with whom *James Klein*, Public Defender Service, was on the brief, for appellant.

*Stephen F. Rickard*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman, Amy H. Zubrensky Cassidy K. Pinegar* and *Ann K.H. Simon*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY and THOMPSON, *Associate Judges*, and STEADMAN, *Senior Judge*.

THOMPSON, *Associate Judge*:    In this matter, appellant Shepardson Blair

was convicted of kidnapping, first-degree sexual abuse with an aggravating

circumstance,[1] and assault with significant bodily injury (felony assault). He seeks reversal of all of his convictions, arguing that the government obtained his DNA that tied him to the crimes pursuant to an invalid warrant. The warrant was invalid, appellant contends, because the government sought it and the court granted it on the basis of tainted information: a report received from the FBI about a match between (1) DNA left on the sexual-abuse victim and (2) DNA taken from appellant without statutory authorization, and in alleged violation of his Fourth Amendment rights, while he was incarcerated in 2005 on a theft conviction. We reject appellant's claim for relief because we conclude that the judge who granted the government's warrant application on the basis of the DNA match did not err in declining to apply the exclusionary rule and that the DNA evidence obtained through the warrant was properly admitted at trial.

Appellant also raises two insufficiency-of-the-evidence claims: He contends that the evidence at trial did not establish that there was penetration of the victim's vulva and that the evidence therefore was insufficient to support a conviction for the completed offense of first-degree sexual abuse. In addition, he argues that his

---

[1] The court determined that there was an aggravating circumstance (a prior sexual assault conviction) after the jury found appellant guilty of first-degree sexual abuse.

felony assault conviction must be reversed because the evidence was insufficient to prove that the victim sustained significant bodily injury. For the reasons explained below, we reject both arguments. Accordingly, we affirm appellant's convictions.

## I.    Background

At trial, the government presented evidence that as the victim C.H. was walking home on the evening of July 14, 2003, an assailant — identified through DNA evidence as appellant[2] — grabbed her by the throat and started to strangle her, dragged her through the grass, pulled her into some bushes, repeatedly slammed her face into the ground, and then pulled down her pants and underwear and tried to push his penis into her vagina.  C.H. was eventually taken by ambulance to a hospital, where an emergency department doctor collected samples from her using a sexual assault kit.

---

[2]  At trial, C.H. was unable to identify appellant as her assailant.

The DNA profile obtained from the sexual assault kit samples was entered into the Combined DNA Index System ("CODIS").[3] Initially, no match was found in the system, and the case went "cold" for several years. In the meantime, on July 28, 2005, while appellant was incarcerated at a federal prison in Maryland as a result of a District of Columbia conviction for first-degree theft, a Bureau of Prisons ("BOP") employee drew a sample of appellant's blood (the "2005 sample") so that his DNA profile could be included in CODIS. However, apparently because of a "significant backlog of samples," the DNA profile from appellant's blood sample was not uploaded into CODIS for over four years. On November 20, 2009, after FBI personnel had finally uploaded the profile into CODIS, they discovered that appellant's DNA matched the DNA profile obtained from C.H.'s sexual assault kit. By letter dated May 5, 2010, the FBI Laboratory Director reported that result to the Metropolitan Police Department ("MPD") Crime Laboratory. The letter also explained that the blood sample had been obtained from appellant without authority of the DNA Analysis Backlog

---

[3] CODIS is "a national project to standardize collection and storage of DNA profiles" authorized by Congress in 1994 and supervised by the Federal Bureau of Investigation ("FBI"). *Maryland v. King*, 133 S. Ct. 1958, 1968 (2013). It "connects DNA laboratories at the local, state, and national level," and generally "collects DNA profiles provided by local laboratories taken from arrestees, convicted offenders, and forensic evidence found at crime scenes." *Id.*

Elimination Act of 2000, Pub. L. 106-546, § 4, 114 Stat. 2726, 2730 (the "DNA Act" or the "Act").

The DNA Act requires the Director of the BOP to "collect a DNA sample from each individual in the custody of the Bureau of Prisons who is, or has been, convicted of a qualifying Federal offense," 42 U.S.C. § 14135a (a)(1)(B), or of a "qualifying District of Columbia offense," 42 U.S.C. § 14135b (a)(1). The Act further requires the Director of the Court Services and Offender Supervision Agency for the District of Columbia ("CSOSA") to do the same with "each individual under the supervision of [CSOSA] who is on supervised release, parole, or probation who is, or has been, convicted of a qualifying District of Columbia offense." 42 U.S.C. § 14135b (a)(2). In addition, the Act provides that "[t]he government of the District of Columbia may determine those offenses under the District of Columbia Code that shall be treated . . . as qualifying District of Columbia offenses." 42 U.S.C. § 14135b (d).

The May 5, 2010, FBI letter explained to the MPD that at the time the BOP obtained the blood sample from appellant, appellant "d[id] not have a conviction for a qualifying federal and/or District of Columbia offense" under the DNA Act.

The felony theft conviction for which appellant was incarcerated in a BOP facility was not a qualifying offense because the Council of the District of Columbia ("the Council") had not included theft on its list of "qualifying District of Columbia offenses."[4] The FBI letter advised that nevertheless,

> [T]here is no information known to the FBI Laboratory that indicates the sample was collected and entered in other than a good faith belief that entry was appropriate and authorized by law. Therefore, based upon the facts and circumstances of this case, it has been determined that the offender's personally identifying information may be released to your laboratory, for its investigative lead value and any other action that you deem appropriate.

The letter provided identifying information for appellant, but further stated that "[a]n administrative removal" of the sample would be performed, "requir[ing] the destruction of the sample and its deletion" from CODIS.

---

[4] *See* D.C. Law 14-52, codified at D.C. Code § 22-4151 (2001). By contrast, in 2004, Congress had "expanded the definition of 'qualified Federal offense' to include '[a]ny felony.'" *Banks v. United States*, 490 F.3d 1178, 1181 (10th Cir. 2007) (alteration in original) (citing 42 U.S.C. § 14135a (d)(1) (reflecting an amendment made by Justice for All Act of 2004, Pub. L. No. 108-405, 118 Stat. 2260).

On the basis of the FBI/CODIS match lead, appellant was arrested and, after a probable cause hearing, detained in the instant case in September 2011. By that time, the Council, through 2009 legislation, had expanded the list of qualifying District of Columbia offenses to include "[a]ny felony." *See* Omnibus Public Safety and Justice Amendment Act of 2009, Act 18–189, codified as amended at D.C. Code § 22-4151 (a) (1).[5] On June 18, 2010, appellant was convicted of another "qualifying" felony offense: attempted burglary in the second degree. He was sentenced to 14 months' imprisonment and was again in BOP custody until his release on March 11, 2011. Thereafter, he was under CSOSA supervision from March 13, 2011, until March 13, 2012. Thus, appellant was once again under CSOSA supervision at the time of the preliminary proceedings in this case in the fall of 2011.

---

[5] Thus, by the time of the proceedings in the instant case, felony theft, the offense for which appellant was incarcerated when the 2005 sample was obtained, had become a qualifying District of Columbia offense under the DNA Act. Appellant was under CSOSA supervision as a result of that felony theft conviction until September 20, 2010. Accordingly, under the DNA Act and the amended District of Columbia "qualifying offense" statute, CSOSA had an obligation to obtain a DNA sample from appellant pursuant to 42 U.S.C. § 14135b (a)(2). According to a government proffer, CSOSA did not do so because it "had not yet been informed by the FBI that the sample had been destroyed, so [it] thought [appellant's] sample had already been taken."

In connection with appellant's incarceration for attempted second-degree burglary and his subsequent CSOSA supervision, the DNA Act mandated that a sample of appellant's DNA be obtained. Nevertheless, it appears that neither BOP nor CSOSA had obtained a post-2005 DNA sample from appellant by the time of the proceedings in this case.[6]

On September 29, 2011, the government filed a motion in this case in which it asked the court to order appellant to submit to "the taking of a blood sample." The government explained that, as part of its standard practice in cases in which a defendant has been identified through a CODIS match, it seeks a DNA sample in order "to confirm the results of the CODIS match" and to meet evidentiary requirements at trial. The government also explained that it sought a sample of appellant's DNA to allow for the testing of additional samples taken from C.H.

---

[6] The prosecutor proffered at the hearing on the government's warrant application that neither the BOP nor CSOSA was aware at the relevant times that the 2005 sample was no longer in the CODIS database. The prosecutor indicated, however, that CSOSA was "subsequently . . . notified by the FBI that the 2005 sample was destroyed" (not indicating when this notification occurred). The government argues that both agencies acted "in conformity with their legal obligations as they would have understood them in light of the condition of the government's databases." It also asserts that "[a]bsent [the] initial mistake in collecting appellant's DNA in 2005, appellant's DNA inevitably would have been collected by BOP when appellant returned to [BOP custody] in July 2010 on his 2010 burglary conviction."

during the sexual assault examination. Appellant opposed the motion, and after a hearing on the matter on October 13, 2011, the court (the Honorable Thomas Motley) granted the government's motion and ordered appellant to submit to DNA testing. The government's motion conceded that the taking of the 2005 sample "constituted a violation of the DNA Act, specifically of 42 U.S.C. 14135b (a)(1)[,]" and Judge Motley agreed with the parties that the 2005 sample "was taken in violation of the statutory framework . . . at the time that it was taken."[7] Judge Motley reasoned, however, that nothing in the DNA Act required suppression of the 2005 sample. He further reasoned that, even assuming (as appellant argued) that the taking of the 2005 sample constituted a Fourth Amendment violation, application of the exclusionary rule in this case would "not deter conduct." Judge Motley noted that appellant had an eligible conviction (the attempted burglary conviction for which, as noted above, he was then under CSOSA supervision), cited the "inevitability of [appellant's] DNA being compared to CODIS" as "clearly evidenced by the facts of this case," and reasoned that the testing authorized by statute "will go on[.]" He stated that even if there was a Fourth Amendment violation in the taking of the 2005 sample, he "believe[d] the

---

[7] In fact, however, while 42 U.S.C. §§ 14135a and 14135b mandate the collection of DNA samples from individuals convicted of qualifying federal or District of Columbia offenses, the Act nowhere prohibits the collection of DNA samples from individuals who have been convicted of non-qualifying offenses.

police acted in good faith" and that he would "not exclude the CODIS hit" or "suppress the use of the DNA obtained in this case."

Acting on the warrant issued by Judge Motley, an MPD detective obtained a sample of appellant's saliva through a buccal swab on October 19, 2011 (the "2011 sample"). The DNA extracted from the sample matched the sample obtained from C.H.'s sexual assault kit. The 2011 sample was introduced as evidence at trial, and appellant was convicted on all counts.

## II.  Appellant's Arguments Regarding the DNA Samples

Appellant's argument as to why he is entitled to reversal of all of his convictions can be summarized as follows:  The BOP took the 2005 sample without a warrant, without individualized suspicion, and, unlike in *Maryland v. King*,[8] without statutory authorization or mandate.  Therefore, the taking of the

---

[8] *See* 133 S. Ct. at 1970 ("The Maryland DNA Collection Act provides that, in order to obtain a DNA sample, all arrestees charged with serious crimes must furnish [a DNA] sample . . . . The DNA collection is not subject to the judgment of officers whose perspective might be colored by their primary involvement in the often competitive enterprise of ferreting out crime. . . . [I]n light of the standardized nature of the tests and the minimal discretion vested in those charged

(continued…)

sample — a "search" within the meaning of the Fourth Amendment[9] — violated appellant's Fourth Amendment right not to be subjected to an unreasonable search or seizure.[10]   Because the 2005 sample was taken unconstitutionally, the

---

(…continued)
with administering the program, there are virtually no facts for a neutral magistrate to evaluate. Here, the search effected by the buccal swab of respondent falls within the category of cases this Court has analyzed by reference to the proposition that the touchstone of the Fourth Amendment is reasonableness, not individualized suspicion."   (citations   and   internal   quotation   marks   omitted)).

[9]  It is well-established that "the taking of a blood sample is a search" for Fourth Amendment purposes.  *Everett v. Napper*, 833 F.2d 1507, 1511 (11th Cir. 1987) (citing *Schmerber v. California*, 384 U.S. 757, 767 (1966)).

[10]  *See, e.g., Missouri v. McNeely*, 133 S.Ct. 1552, 1558 (2013) (citing the "importance of requiring authorization by a neutral and detached magistrate before allowing a law enforcement officer to invade another's body in search of evidence of guilt" unless a recognized exception to the warrant requirement applies) (internal quotation marks omitted).  The Supreme Court explained in *New York v. Burger*, 482 U.S. 691 (1987), that a statutory inspection program that serves a substantial government interest may provide a "'constitutionally adequate substitute for a warrant'" if, in terms of the "certainty and regularity of its application," it "limit[s] the discretion of the inspecting officers."  *Id.* at 702-03. Distinguishing that case and *King*, appellant argues that the government did not have a "substantial interest" in collecting his DNA in 2005 because the Council had not designated the crime for which he was incarcerated as a qualifying offense under the DNA Act.  Appellant relies on *Koch v. Lockyer*, 340 F. App'x 372, 374 (9th Cir. 2009) (reasoning that forcible extraction of Koch's DNA violated his Fourth Amendment rights where his offense was not a qualifying offense, meaning that the state legislature had not expressed an interest in obtaining his DNA at the time it was collected).

exclusionary rule[11] was applicable, meaning that the government should have been precluded from using the information derived from the 2005 sample (i.e., the CODIS match) to establish probable cause for the warrant permitting the government take the 2011 sample.[12] Appellant further contends that the

---

[11] *See, e.g., Wong Sun v United States*, 371 U.S. 471, 484 (1963) ("In order to make effective the fundamental constitutional guarantee[] . . . of . . . inviolability of the person, . . . this Court held nearly half a century ago that evidence seized during an unlawful search could not constitute proof against the victim of the search. The exclusionary prohibition extends as well to the indirect . . . products of such invasions.") (citation omitted). Citing *United States v. Edelen*, 529 A.2d 774, 783 (D.C. 1987) (rejecting "the government's argument that the violation of a statutory rule does not permit suppression of evidence"), appellant also argues that even if the taking of 2005 sample did not violate his Fourth Amendment rights, the exclusionary rule applies because of the (alleged) statutory violation. In addition, citing *In re Dominic W.*, 426 A.2d 432, 434 (Md. Ct. Spec. App. 1981) (applying the exclusionary rule with respect to the fruits of a search by a school assistant principal), and other cases, appellant urges us to reject the government's argument that the exclusionary rule applies only to the fruits of police misconduct and does not support exclusion of evidence obtained by other types of government officials. *But see*, *e.g.*, *Michigan v. Tucker*, 417 U.S. 433, 447 (1974) ("The deterrent purpose of the exclusionary rule necessarily assumes that *the police* have engaged in . . . conduct which has deprived the defendant of some right.") (emphasis added).

[12] Appellant relies on *James v. United States*, 418 F.2d 1150, 1151-52 (D.C. Cir. 1969) ("When an affidavit in support of a search warrant contains information which is in part unlawfully obtained, the validity of a warrant and search depends on whether the untainted information, considered by itself, establishes probable cause for the warrant to issue."). *But see United States v. Thomas*, 736 F.3d 54, 59-60, 66 (1st Cir. 2013) (in which the court, which like "[m]ost other circuits" follows the rule announced in *James*, *see United States v. Dessesaure*, 429 F.3d 359, 366 (1st Cir. 2005), agreed that "the obtaining of [a 2005] buccal swab [from Thomas was] a violation of the Fourth Amendment" and noted the government's concession that without the DNA profile from the 2005 sample, the police would

(continued…)

government cannot show that an exception to the exclusionary rule applied.[13]  The

government may not rely on the good-faith exception,[14] appellant argues, because

the prosecution did not show, and the trial court had no basis for finding, that the

2005 sample was obtained through an isolated act of negligence by BOP personnel

rather than as a result of a malicious or arbitrary targeting of appellant or a

deliberate violation of his rights.[15]  For the same reason, appellant argues, the

---

 (…continued)
not have been able to link Thomas to the charged offense or to supply probable
cause for the warrant that enabled them to search his home, arrest him, and obtain a
new DNA sample from him in 2011, but reasoned that these facts did not "dictate
the result of [its] exclusionary rule analysis" and held that "application of the
exclusionary rule would be outweighed by the resulting costs to the criminal
justice system").

[13]  Appellant cites *Barnett v. United States*, 525 A.2d 197, 200 (D.C. 1987)
("[T]he burden is on the government to go forward with evidence that will bring
the case within one or more exceptions to the exclusionary rule.").

[14]  Under the good-faith exception to the exclusionary rule,
unconstitutionally obtained evidence need not be suppressed if law enforcement
officials had an objectively reasonable belief that their conduct was lawful.  *See
United States v. Leon*, 468 U.S. 897, 919-20 (1984).

[15]  Appellant asserts that "[a]ny reasonable person who examined the statute
in 2005 would have understood that [appellant] did not have a conviction for a
qualifying offense and, thus, that the statute did not authorize taking his DNA."

government cannot show that application of the exclusionary rule would have no deterrent effect.[16]

Nor, appellant urges, did the inevitable discovery doctrine apply. "The inevitable discovery doctrine provides that, even though the police have obtained evidence as a result of illegal conduct, the evidence still may be admitted '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" (*Willie*) *Hicks v. United States*, 730 A.2d 657, 659 (D.C. 1999) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). Appellant emphasizes that application of the doctrine is confined "to cases in which discovery of the evidence is truly inevitable," such that "the court is persuaded with certainty that the evidence would have been discovered lawfully." *United States v. Allen*, 436 A.2d 1303, 1310 (D.C. 1981) (internal quotation marks omitted); *see also Hilliard v. United States*, 638 A.2d 698, 707 (D.C. 1994) ("The facts of this case fall within the parameters of the [inevitable discovery] rule" because "discovery of the weapon was certain[.]").

---

[16] Appellant notes that even though the Council amended the list of District of Columbia qualifying offenses to include all felonies, it has not mandated the collection of DNA samples from everyone convicted of a crime in the District of Columbia, and thus opportunities for malicious sample collection still exist.

Appellant cites the Supreme Court's explanation that the doctrine "involves no speculative elements but focuses [instead] on demonstrated historical facts capable of ready verification or impeachment." *Nix*, 467 U.S. at 444-45 n.5. Thus, appellant contends, for the government to avail itself of the doctrine, courts have required it to prove through the presentation of *evidence* (and not through mere argument or proffer) that the "evidence inevitably would have been found." *See id.* at 450.[17] Appellant also invokes this court's statement that "the lawful process

---

[17] *See also id.* at 448-49 (describing the *testimony* by an agent of the Iowa Bureau of Criminal Investigation establishing that, before defendant Williams told police that the victim's body could be found in a culvert in Polk County, the agent had "organized and directed some 200 volunteers who were searching for the . . . body" and had instructed them to "'check all the roads, the ditches, [and] any culverts'" and that "if the search had not been suspended because of Williams' promised cooperation, [the volunteers' search] would have continued into Polk County," a map of which the agent had obtained; ultimately concluding that "[o]n this record it is clear that the search parties were approaching the actual location of the body . . . and the body inevitably would have been found"); *McFerguson v. United States*, 770 A.2d 66, 75-76 (D.C. 2001) (agreeing that on the record before the court the prosecutor had not eliminated speculation about whether officers' warrantless search of a bag and retrieval of its stolen contents entered into their decision to summon the complainant to the scene, and remanding for further fact-finding based on the *testimony*, and a possible re-opening of the *evidentiary hearing*, to determine the government had met its burden of showing inevitable discovery); *Haynes v. State*, 127 S.W.3d 456, 463-64 (Ark. 2003) (upholding the denial of a motion to suppress DNA evidence in a case in which Haynes's blood was illegally taken in 1997 while he was incarcerated for nonpayment of child support, a non-qualifying offense, and in which the sample yielded a DNA profile that generated a positive "hit" in the State's DNA database, was relied on by the State to show probable cause to obtain a sample of blood and other bodily fluids from Haynes, and led to the trial evidence that linked Haynes to the rape and burglary of which he was convicted; reasoning that because Haynes had been

(continued…)

which would have ended in the inevitable discovery [must] have . . . commenced before the constitutionally invalid seizure." *Douglas-Bey v. United States*, 490 A.2d 1137, 1139 n.6 (D.C. 1985); *see also United States v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015) (stating that for the inevitable discovery doctrine to apply, "[t]he government must . . . establish that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct" and explaining that "the purpose of the requirement of active pursuit is to exclude evidence that was not being sought in any fashion") (internal quotation marks omitted).[18]

The inevitable discovery doctrine does not apply in this case, appellant argues, because "the only 'demonstrated historical facts' are that the government

---

(…continued)
convicted of residential burglary in 2000, and because the State DNA Act was amended in 2001 to require a DNA sample from any person convicted of burglary, it was inevitable that Haynes's DNA would have been taken and a DNA match obtained, since, *according to testimony* by the supervisor of the Forensic Biology Section of the State Crime Lab, "even in 1997, blood samples had been taken from *all* the prisoners" (emphasis in the original)).

[18] *See generally* 6 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.4 (a), at 363-65 (5th ed. 2012) (citing authority that "[c]ircumstances justifying application of the 'inevitable discovery rule are most likely to be present if these investigative procedures were already in progress prior to the discovery via illegal means" *or* "where the circumstances are such that, pursuant to some standardized procedures or established routine a certain evidence-revealing event would definitely have occurred later").

has repeatedly made errors in the DNA collection process and *failed* to lawfully take Mr. Blair's DNA when it had the opportunity to do so." Appellant emphasizes that the government relied solely on proffers and predictions by the prosecutor that BOP or CSOSA would have taken a sample of appellant's DNA if the 2005 sample had not been taken, and presented no evidence that either BOP or CSOSA adhered to a practice of always or almost always collecting DNA samples as mandated by law, i.e., no evidence that, at the time the 2005 sample was taken, or even thereafter, either agency was actively pursuing full compliance with the Act's DNA-collection mandate.[19] Appellant asserts that "[t]he best evidence that the government would *not* have inevitably taken [his] DNA is, simply, that they did not take his DNA," even though it was undisputed that, at some point before the October 13, 2011, hearing, both agencies had learned that there was no DNA sample on file for him.[20]

---

[19] Appellant cites *United States v. Achana-Suaso*, 568 F. App'x 627, 631-32 (10th Cir. 2014) ("[T]he government cannot carry its burden [of proving that the evidence would have been discovered without the Fourth Amendment violation] where there is no evidence to support its position.").

[20] Nor, appellant argues, does the "independent source" doctrine apply in this case. Citing *Murray v. United States*, 487 U.S. 533, 542 (1988), he argues that even in light of the statutory mandate for CSOSA to collect DNA from appellant in 2011, if a "decision to exercise that statutory authority was . . . motivated by knowledge gained solely from the illegal 2005 search," the search would not be independent of the illegality, and the exclusionary rule would still apply.

Accordingly, appellant argues, because Judge Motley was obligated to disregard the CODIS match, and because the government had no other basis to suspect appellant of the charged offenses, Judge Motley erred in granting the order compelling him to submit to the taking of the 2011 sample. Further, appellant asserts, because his convictions were based on the DNA match between sexual assault kit samples and the 2011 sample, the convictions may not be sustained.[21]

## III.  Analysis

We need not address all of appellant's arguments because even assuming (without deciding) that they all are meritorious as far as they go, we conclude that this is not a case in which the trial court was required to apply the exclusionary

---

[21] *See*, *e.g.*, *In re K.H.*, 14 A.3d 1087, 1092 (D.C. 2011) ("Evidence derived, directly or indirectly, from violation of a defendant's Fourth Amendment rights is subject to exclusion at the defendant's trial unless the prosecution demonstrates that the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the taint imposed upon that evidence by the original illegality.") (internal quotations marks omitted). Appellant did not file a motion to suppress the 2011 confirmatory DNA sample, but argues that given Judge Motley's ruling ("the [c]ourt will not suppress the use of the DNA obtained in this case"), such a motion would have been futile and a "pointless waste of time."

rule, i.e., to exclude the evidence that was the fruit of the 2005 DNA sample. In other words, we discern no error in Judge Motley's ruling that he would "not exclude the CODIS hit" or "suppress the use of the DNA obtained in this case."

The exclusionary rule is a "prudential rather than constitutionally mandated" rule, which is "applicable only where its deterrence benefits outweigh its 'substantial social costs.'" *Pennsylvania Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998) (explaining that "the rule does not 'proscribe the introduction of illegally seized evidence in all proceedings or against all persons,' . . . but applies only in contexts 'where its remedial objectives are thought most efficaciously served[.]'" (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976))); *see also Illinois v. Krull*, 480 U.S. 340, 347 (1987) ("[A]pplication of the exclusionary rule properly has been restricted to those situations in which its remedial purpose is effectively advanced."). As the United States Court of Appeals for the Second Circuit has observed, "[t]he Supreme Court has restricted application of the exclusionary rule to those circumstances where its deterrent effect would most likely be 'substantial and efficient,'" and "has cautioned that any extension of the rule beyond its core application — normally, barring use of illegally seized items as affirmative evidence in the trial of the matter for which the search was conducted — must be justified by balancing the 'additional marginal deterrence' of

the extension against the cost to the public interest of further impairing the pursuit of truth." *Tirado v. Commisioner of Internal Revenue*, 689 F.2d 307, 310 (2d Cir. 1982) (quoting *United States v. Janis*, 428 U.S. 433, 453 (1976)). Thus, exclusion is not "a necessary consequence of a Fourth Amendment violation." *Herring v. United States*, 555 U.S. 135, 141 (2009). "Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" (*Willie*) *Davis v. United States*, 131 S. Ct. 2419, 2426-27 (2011) (quoting *Janis*, 428 U.S. at 454). "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Id.* at 2427.

As the Supreme Court further explained in *Herring*, the exclusionary rule "serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence" as opposed to "mistakes [that] are the result of negligence." 555 U.S. at 144, 147. "An error that arises from nonrecurring and attenuated negligence is . . . far removed from the core concerns that led [the Court] to adopt the rule in the first place." *Id.* at 144.[22] The Court has

---

[22] The *Herring* majority did not explain what it meant by "attenuated negligence." However, Professor LaFave has suggested that courts are "well-advised" in applying *Herring* to interpret the term as a reference to negligence involving a mistake in law enforcement records involving personnel other than the law enforcement employee who actually conducted the search. 1 Wayne R.

(continued…)

"never applied the rule to exclude evidence obtained in violation of the Fourth Amendment, where the police conduct was no more intentional or culpable than [that]." *Id.*; *see also Davis*, 131 S. Ct. at 2427-29 (admonishing that when police "conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way" and that the exclusionary rule is not "to become a strict-liability regime" (internal citations and quotation marks omitted)); *United States v. Wright*, 777 F.3d 635, 642 (3d Cir. 2015) ("[T]he Supreme Court has unequivocally held that deterring isolated negligence is not worth the social cost of excluded evidence. Only if mistakes of this nature recur with some frequency will a criminal defendant be in a position to argue that the calculus has changed.") (citation omitted). Thus, "[t]o trigger the exclusionary rule," the conduct that was violative of a defendant's rights must be both "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently

---

(…continued)

LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 1.6 (i) at 297, 311 (5th ed. 2012). The United States Court of Appeals for the Ninth Circuit has employed a similar interpretation. *See United States v. Camou*, 773 F.3d 932, 945 (9th Cir. 2014) (noting that in *Herring*, the officer who executed the arrest warrant was not negligent himself and that the negligence was "two degrees removed from the officer," and reasoning that the holding in *Herring* should be read as applying to the situation where "an officer reasonably relies on incorrect information that was the result of *another* individual's 'isolated' and 'attenuated' negligence," *id*. at 945 n.3 (emphasis in original)).

culpable that such deterrence is worth the price paid by the justice system."
*Herring*, 555 U.S. at 144.[23]

"[T]he deterrent effect of the exclusionary rule must be judged at the point of the constitutional violation, and the culpability of the actors involved then." *United States v. (Whitley) Davis*, 690 F.3d 226, 253 (4th Cir. 2012). "In evaluating the need for a deterrent sanction, one must first identify those who are to be deterred" and whose "conduct . . . is to be controlled." *Janis*, 428 U.S. at 448. "Determining when the likelihood of substantial deterrence justifies excluding evidence requires some assessment of the motives of the officials who seized the challenged evidence." *Tirado*, 689 F.2d at 310. "If it is not likely to occur to potential wrongdoers as they seize the challenged evidence to care about its use for the particular purpose later in issue, then removing the possibility of that use is unlikely to deter them from unlawful conduct." *Id.* at 310-11. "The deterrent purpose of the exclusionary rule would not be significantly advanced by

---

[23] Applying this instruction, the United States Court of Appeals for the Third Circuit recently affirmed that even where a warrant is facially invalid, "the Supreme Court's . . . recent decision in *Herring* . . . require[s] an additional analytical step before the exclusionary rule [can] be applied." *Wright*, 777 F.3d at 638 (applying the holding in *United States v. Wright*, 493 F. App'x 265, 273 (3d Cir. 2012), that "a court must always analyze whether the exclusionary rule should apply before suppressing evidence.").

. . . suppress[ing] . . . illegally seized evidence in a [proceeding] in which the offending police officers could not possibly have had an interest at the time they conducted the illegal search." *United States v. Rea*, 678 F.2d 382, 389 (2d Cir. 1982). "Thus, in order to decide whether application of the exclusionary sanction is likely to have a significant deterrent effect, the key question is whether the particular challenged use of the evidence is one that the seizing officials were likely to have had an interest in at the time – whether it was within their predictable contemplation and, if so, whether it was likely to have motivated them." *Tirado*, 689 F.2d at 311 (noting that "[s]ince we cannot read the minds of the officers and lack the guidance of sound empirical models, we must rely, instead, on our own assumptions of human nature and the interrelationship of the various components of the law enforcement system" (internal quotation marks and alterations omitted)). "It would be unsound to invoke the exclusionary rule on the assumption that officers of one federal agency [who committed the violation] have such a strong motivating interest in all federal law enforcement concerns that broad application of the rule will achieve significant marginal deterrence." *Id.* at 313.

In this case, Judge Motley found that government officials had acted in good faith and that application of the exclusionary rule in this case would "not deter conduct." Although there was a limited basis for that "good faith" assessment (the

statements in the FBI's letter, and the government's candor about the unauthorized 2005 sample that was the basis for the CODIS match), we see no reason to reject it[24] and a number of reasons to accept it. The first is that appellant's counsel acknowledged at the October 13, 2011, hearing that he did not "know of any" bad faith in this case. Nor on appeal does appellant argue that the BOP employees who drew his blood in 2005 did so with "knowledge, or may properly [have been] charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Herring*, 555 U.S. at 143 (internal quotation marks omitted) (stating that absent such knowledge or constructive knowledge, evidence should not be suppressed because "[t]he extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct"); *see also Thomas*, 736 F.3d at 61 (declining to apply the exclusionary rule where the court saw "no evidence . . . that the postal inspectors involved in obtaining and executing the subpoena [for a DNA sample in 2005] knowingly engaged in any misconduct").

---

[24] *Cf. United States v. Humbert*, 336 F. App'x 132, 136 (3d Cir. 2009) (holding that it was not error to use Humbert's original blood sample to support a probable cause determination to obtain a new sample even if his DNA was obtained in violation of Pennsylvania law, noting there was "no evidence that there was 'recurring or systemic negligence' in how the [Pennsylvania DNA] database was maintained or in how Pennsylvania obtained the samples").

Further, although the theft conviction for which appellant was incarcerated in 2005 was not a District of Columbia qualifying offense at the time the 2005 sample was taken, under then-recently-amended federal law, all felonies were qualifying federal offenses. *See* 42 U.S.C. § 14135a (d)(1) (as amended on October 30, 2004 by § 203(b) of Pub. L. 108-405). The fact that BOP personnel obtained a blood sample from appellant in 2005 is more suggestive of a negligent failure to recognize the differing treatment of appellant's offense under District and the amended federal "qualifying offense" law (or of a negligent failure to recognize that appellant was a District of Columbia, rather than a federal, offender) than it is of a flagrant disregard of the law or of prisoners' rights. *See Leon*, 468 U.S. at 911 ("[I]n deciding whether exclusion is appropriate in a particular case . . . an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus.").

In addition, while the record reveals nothing about the 2005 actors, case law suggests that the conduct of whichever BOP employee took appellant's blood sample was an act of attenuated negligence, i.e., that that employee relied on mistaken information from another employee. *See United States v. Carmichael*, 343 F.3d 756, 758 (5th Cir. 2003) (citing BOP policy, described in a 2002 memorandum, that "offenders in [BOP] custody are to be screened by local

Community Corrections Management Offices to determine whether they are qualified offenders under the DNA Act" and that "[o]nce an inmate arrives at his designated [BOP] correction facility, the facility's Health Services staff will arrange to collect a DNA sample during the routine physical examination"); *cf. Camou*, 773 F.3d at 945 n.3 (reasoning that the rule of *Herring* applies where "an officer reasonably relies on incorrect information that was the result of *another* individual's 'isolated' and 'attenuated' negligence" (emphasis in original)).

Moreover, there are several reasons why we agree with Judge Motley's reasoning that application of the exclusionary rule in this case would "not deter conduct."[25] A major reason is that, in the wake of the change in District of Columbia law to include "any felony" as a District of Columbia qualifying offense, there is no need to apply the exclusionary rule to deter BOP personnel from again making the mistake (if that is what it was) that occurred regarding appellant's blood sample. *Cf. Davis*, 690 F.3d at 256 (declining to apply the exclusionary rule because "[t]here is nothing in the record to suggest that the acts here are likely to reoccur"). Another reason is that six years had passed between the unauthorized

---

[25] The government emphasizes the Supreme Court's statement in *Leon* that "the exclusionary rule is designed to deter *police* misconduct." 468 U.S. at 916 (italics added). For purposes of our analysis, we assume without deciding that it is not only police misconduct that can trigger possible application of the rule.

conduct by BOP personnel in 2005 and the October 2011 hearing on the government's motion for a blood order (and now, ten years have passed). While it is true that the 2010 CODIS match and the 2012 trial evidence in appellant's case were the fruit of the 2005 sample, case law supports an assumption that the passage of time has attenuated any deterrent effect of excluding the fruit of the 2005 sample. *See United States v. Ceccolini*, 435 U.S. 268, 279 (1978) (citing the "[s]ubstantial periods of time [that] elapsed between the time of the illegal search" and the follow-up contact with the witness whose inculpatory statement resulted from the search, as one basis for holding that "the degree of attenuation was . . . sufficient to dissipate the connection between the illegality" and the witness's trial testimony); *Thomas*, 736 F.3d at 62 (reasoning that the "hypothesized deterrent effect is simply too attenuated to justify applying the exclusionary rule" since "[t]he underlying conduct that violated the Fourth Amendment took place six or seven years ago"); *United States v. Lopez-Martinez*, 725 F.2d 471, 476 (9th Cir. 1984) ("We hold that the additional measure of deterrence that might be provided by the exclusion in the 1982 trial of statements from the 1974 arrest is too small to outweigh the cost to society of the loss of relevant and probative evidence in the 1982 proceeding.").[26]

---

[26] *See also* (*Adonis*) *Hicks v. United States*, 705 A.2d 636, 641 (D.C. 1997) (recognizing that one of the "several factors for consideration in determining

(continued…)

Furthermore, it appears that the FBI's practice — evidenced in the instant case (through the FBI's May 5, 2010, letter) as well as in *Kadri v. Bureau of Prisons*, No. 05-0517, 2006 WL 581249, at *1 (D.D.C. Mar. 9, 2006) (noting that the FBI destroyed the prisoner's wrongfully taken DNA sample and removed his DNA profile from the DNA database) — is to remove DNA profiles from the CODIS database when the profiles were determined to have been taken in error and to release DNA match results to police departments only where "information . . . indicates the sample was [not] collected . . . other than [in] good faith." That practice provides a disincentive to deliberately taking unauthorized samples that further obviates deterrence through application of the exclusionary rule. *Cf. Thomas*, 736 F.3d at 62 (reasoning that "[i]t is difficult to see why" application of the exclusionary rule in a later and unforeseen prosecution would act to deter the law enforcement agents who committed the Fourth Amendment violation "any more than they would have already been deterred" by exclusion of the results of their search at a point closer in time). And, to the extent that the BOP personnel might nevertheless be overzealous in pursuing the goals of the DNA Act ("solving

---

 (…continued)
whether the primary taint of illegal police conduct has been purged" is "the temporal proximity of the illegal seizure and the discovery of the contraband").

past and future criminal investigations, exonerating the innocent and deterring recidivism," *United States v. Sczubelek*, 255 F. Supp. 2d 315, 323 (D. Del. 2003)), there is no particular reason to think that exclusion of DNA evidence from future criminal trials would deter them from collecting DNA samples that they may think could at least be used to exonerate innocent persons or to deter recidivism.

Finally, we discern no basis for believing that application of the exclusionary rule in this case would have a significant effect on the BOP personnel who took appellant's 2005 DNA sample while he was incarcerated for first-degree theft or on their current counterparts. Although the BOP is a law enforcement agency as that term is broadly defined, it may be presumed that BOP personnel involved in taking appellant's blood sample in 2005 and forwarding it for inclusion of his DNA profile in CODIS were "not adjuncts to the law enforcement team engaged in the often competitive enterprise of ferreting out crime." *Arizona v. Evans*, 514 U.S. 1, 15 (1995). The parties agree that no one then suspected appellant of the sexual assault of C.H.,[27] the BOP staff were not authorized to

---

[27] Thus, the circumstance here was quite different from that in *Lewis v. Brazell*, Nos. 4:12-cv-04100 & 4:12-cv-04139, 2015 WL 1138650, at \*1, 3, 7 (W.D. Ark. Mar. 13, 2015), in which a nurse, acting "at the request of the Criminal Investigation Division of Miller County Sheriff's Office," unlawfully collected a DNA sample from plaintiff Lewis while he was in jail on a charge of rape.

conduct criminal investigations using the DNA samples they collected,[28] and we have no reason to think that possible admission of DNA evidence in a future criminal proceeding was "important enough to [them] to encourage them to violate Fourth Amendment rights" by taking unauthorized DNA samples.[29] *Janis*, 428 U.S. at 458 n.35 (reasoning that where use of improperly seized evidence "falls outside the offending officer's zone of primary interest," "the deterrent effect of the exclusion of relevant evidence is highly attenuated," and "imposition of the exclusionary rule . . . is unlikely to provide significant, much less substantial, additional deterrence," *id.* at 457-58). For that reason, "[t]he threat of exclusion of evidence could not be expected to deter such individuals" from taking unauthorized DNA samples. *Evans*, 514 U.S. at 15; *see also People v. Casillas*, No. 12CA0703, 2015 WL 795765, at *6 (Colo. App. Feb. 26, 2015) (concluding that suppression of the cheek-swab DNA evidence obtained from a juvenile by his

---

[28] "The DNA Act does not authorize . . . the Bureau of Prisons . . . to conduct criminal investigations of supervisees using the DNA samples." *United States v. Reynard*, 220 F. Supp. 2d 1142, 1167 (S.D. Cal. 2002). Rather, BOP turns the DNA samples over to the FBI. *See Kaemmerling v. Lappin*, 553 F.3d 669, 673 (D.C. Cir. 2008).

[29] The Maryland BOP personnel who took the 2005 sample had no obvious incentive to compete to solve cold, District of Columbia cases; they are quite unlike the police detective whose conduct is described in *Friedman v. Boucher*, 580 F.3d 847 (9th Cir. 2009), who forcibly took a detainee's DNA sample because he "simply wanted the sample as an aid to solve cold cases." *Id.* at 851.

probation officer in violation of the Fourth Amendment would have no deterrent value because the juvenile "was neither suspected of violating a term or condition of his deferred adjudication nor suspected of committing a crime" and thus the probation officer "was performing nothing more than a supervisory function under the direction of the juvenile court" and had "no stake in the outcome of criminal prosecutions").

In light of all the foregoing, we find it difficult to believe that application of the exclusionary rule would have any significant deterrent effect on the BOP officials who took the 2005 sample or on their current counterparts. And, even if there is some slight deterrent effect to be achieved by applying the exclusionary rule in this case, [30] we think it would not be "worth the price paid by the justice system." *Herring*, 555 U.S. at 144 (i.e., the price of effectively foreclosing appellant's conviction of the first-degree sexual abuse of C.H., since he became a

---

[30] To decline to apply the exclusionary rule, a court need not find that it would have *no* deterrent effect whatsoever; rather, Supreme Court jurisprudence requires that any deterrence "be weighed against the substantial social costs exacted by the exclusionary rule." *Herring*, 555 U.S. at 144 n.4 (internal quotation marks omitted).

suspect only because of the 2005 sample).[31]  Accordingly, we can find no error in Judge Motley's determination not to apply the exclusionary rule and to issue the warrant on the basis of the CODIS match.  He could reasonably conclude that in this case, the exclusionary rule "cannot 'pay its way.'"  *Davis*, 131 S. Ct. at 2428 (quoting *Leon*, 468 U.S. at 907 n.6).

Although "it is clear that in some circumstances [an] officer will have no reasonable grounds for believing that [a] warrant was properly issued[,]" "'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'"  *Leon*, 468 U.S. at 922-23 (quoting *United States v. Ross*, 456 U.S. 798, 823 n.32 (1982)).  "[T]he officer's reliance on the [court's] probable-cause determination and on the technical sufficiency of the warrant [the court] issues must be objectively

---

[31]  As noted above, *see supra* note 20, appellant appears to argue that any future effort by law enforcement to take a sample of appellant's DNA motivated by knowledge gained from the 2005 search would be of questionable legality, notwithstanding statutory authority for the search.  Thus, if appellant's position is taken to its logical end, law enforcement officials would be deterred from urging CSOSA and BOP to comply with their obligations under the DNA Act.  Yet, the objective of the exclusionary rule is not to "put the police in a worse position than they would have been in absent any error or violation."  *Nix*, 467 U.S. at 443.  "The cost of permanently [rendering appellant's DNA off-limits] is too great for an evenhanded system of law enforcement to bear in order to secure such a speculative and very likely negligible deterrent effect."  *Ceccolini*, 435 U.S. at 279-80.

reasonable[.]" *Id.* at 922. Here, because Judge Motley reasonably declined to apply the exclusionary rule even after having been informed about the "violation of the statutory framework" entailed in obtaining the 2005 sample, it was objectively reasonable for the MPD to rely on Judge Motley's order as authority to do so. We therefore reject appellant's *sub silentio* claim that the 2011 DNA evidence — the fruit of the 2005 sample — was required to be excluded at trial.

## IV. Sufficiency of the Evidence

We turn next to appellant's insufficiency-of-the-evidence claims. When reviewing a claim that the evidence in a criminal trial was insufficient to support the conviction, we "view the evidence in the light most favorable to the government, mindful of the jury's right to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Robinson v. United States*, 506 A.2d 573 (D.C. 1986). "In order to establish a claim of insufficient evidence, appellant must show that the government failed to provide evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt." *Derosiers v. District of Columbia*, 19 A.3d 796, 798-99 (D.C. 2011) (internal quotation marks

omitted).  This is a "heavy burden."  *Schools v. United States*, 84 A.3d 503, 508 (D.C. 2013).

A. *The evidence was sufficient to show that appellant penetrated C.H.'s vulva.*

Appellant contends that "[t]he government failed to prove beyond a reasonable doubt that, in attempting intercourse, [appellant] actually penetrated any part of [C.H.'s] body with his penis."  Specifically, appellant argues that while the evidence was that there was contact between appellant's penis and C.H.'s vulva, it "d[id] not necessarily establish penetration of the vulva."

An individual commits first-degree sexual abuse if he "causes another person to be engaged in . . . a sexual act . . . [b]y using force against that other person."  D.C. Code § 22-3002 (a) (1) (2012 Repl.).  As defined by D.C. Code § 22-3001 (8) (A), and as pertinent here, a "sexual act" includes "[t]he penetration, however slight, of the . . . vulva of another by a penis."  "[T]he government need not prove full penetration since the offense is committed if the male organ enters only the labia of the female organs."  *Graham v. United States*, 746 A.2d 289, 297 n. 8 (D.C. 2000) (internal quotation marks omitted).

At trial, C.H. testified that she felt her assailant pushing "into [her] vagina" and told the jury that he "tried several times to push himself further inside of [her]" with his non-erect penis. Dr. Jeffrey Smith, director of the emergency department at George Washington University Hospital, who examined and treated C.H. after the incident, explained at trial that the vulva includes "all the external area" of a woman's genitalia, including "the clitoris[,] . . . [and] the labia minor and majora," Dr. Smith testified that he found a "significant amount of" debris, dirt, and plant material in C.H.'s vulva, including in the introitus that leads to the vaginal canal and "right around . . . the labia majora and labia minora," "[o]uter and inner area."[32]

Although appellant argues that C.H. was using the term "vagina" imprecisely and may have been referring to her external genital area rather than her vaginal canal, we are satisfied that the foregoing evidence was sufficient to permit the jury fairly to infer that appellant's penis penetrated C.H.'s vulva, if not her vagina. Her testimony that her assailant pushed "into" her and then tried to push himself "further inside" of her permitted the jury to infer that appellant penetrated,

---

[32] Dr. Smith referred to Government Exhibit 17, a drawing of the external vaginal area and rectal area and used it to show the jury where the plant and dirt material was found around the vaginal opening.

at least, C.H.'s labia majora, which Dr. Smith described as the "outer" area of her vulva. Additionally, given the evidence jurors heard about the violent nature of the attack, they could have also reasonably inferred that appellant's pushing was forceful, resulting in penetration of at least the outer labia. *See In re L.L.*, 974 A.2d 859, 867 (D.C. 2009) ("Penetration of the female organs may be proved by circumstantial evidence.") (internal quotation marks and alteration omitted). In that "[t]he slightest penetration . . . is sufficient to sustain a conviction," *see Graham*, 746 U.S. at 297 (internal quotation marks omitted), a conviction for the completed offense of first-degree sexual abuse was well-supported here.

> *B. The evidence was sufficient to prove that appellant caused C.H. "significant bodily injury."*

The felony assault statute provides that "[w]hoever unlawfully assaults, or threatens another in a menacing manner, and intentionally, knowingly, or recklessly causes *significant bodily injury* to another shall be fined . . . or be imprisoned not more than 3 years, or both." D.C. Code § 22-404 (a)(2) (2012 Repl.) (emphasis added). Appellant contends that the evidence was insufficient to show that C.H. sustained significant bodily injury during the attack. He asserts that, although C.H. was hospitalized, "there [was] no evidence that [she] needed treatment to prevent 'long-term physical damage' or any kind of 'permanent injury,'" or that the medication she was provided "required a prescription."

"[S]ignificant bodily injury" is defined in the statute as "an injury that requires hospitalization or immediate medical attention." D.C. Code § 22-404 (a)(2). This court's opinion in *In re R.S.*, 6 A.3d 854 (D.C. 2010), established that there is significant bodily injury where:

> there is an injury to the body that necessitates the individual being taken to the hospital or receiving medical treatment shortly after the injury was inflicted. Hospitalization or medical treatment is required where it is necessary to preserve the health and well-being of the individual, e.g., to prevent long-term physical damage, possible disability, disfigurement, or severe pain.

*Id.* at 859 (holding that an ear injury that required four to six stitches qualified as significant bodily injury) (ellipses omitted). We noted in *R.S.* that "the threshold for significant bodily injury is markedly less severe than that required for aggravated assault" and that the focus is not on whether the injury was "so grave as to require transport by ambulance to a hospital" but rather "on the nature of the injury itself and the practical need in the ordinary course of events for prompt medical attention." *Id.*

Subsequently, in *Quintanilla v. United States*, 62 A.3d 1261, 1265 (D.C. 2013), we clarified the meaning of "significant bodily injury." The victim in *Quintanilla* suffered injuries to her head and hand during a robbery. *Id.* at 1262. She testified that after the robbery, her head throbbed for "a week and a half," she had swelling from her right eye to behind her right ear, some of the fingers on her injured hand "stayed swollen for about three weeks," the injury to her index finger caused "a lot of pain" and rendered the finger "almost unusable for about two months," and she had bruising on her legs. *Id.* When an ambulance arrived, the "EMTs on board" took the victim into their ambulance, "'checked [her] out,'" and provided "'some cold compresses for [her] head and hand,'" but did not offer medication. *Id.* at 1263. The EMTs also checked for a concussion but told her that she was "fine" and that they didn't think she had one and also told her that her finger probably was not broken. *Id.* She "declined transportation to the hospital," never took any medication, other than aspirin, for her injuries, and she "just kept icing" her fingers. *Id.* We held that the victim's injuries did not constitute "significant bodily injuries," *id.* at 1262, explaining that the term does not include injuries that are "seemingly significant enough to invite medical assistance," but that "do not actually 'require' it, meaning the victim would not suffer additional harm by failing to receive professional diagnosis and treatment." *Id.* at 1265. We further instructed that "everyday remedies such as ice packs, bandages, and self-

administered over-the-counter medications, are not sufficiently 'medical' to qualify under the statute, whether administered by a medical professional or with self-help." *Id.*[33]

Perhaps because the victim in *Quintanilla* did not receive hospital-level services, we focused our analysis on the meaning of "medical attention," explaining that it means the treatment that is "necessary to preserve or improve the victim's health," *id.* at 1264 n.18; that "the 'attention' required — 'treatment' — is not satisfied by mere diagnosis,"; and that "[t]reatment of a higher order, requiring true 'medical' expertise, is required" for there to be significant bodily injury. *Id.* at 1264-65. We added — reading the "e.g." in the test laid down in *R.S.* to mean "i.e." in the case of medical treatment — that "treatment, to be 'medical,' must be aimed at preventing 'long-term physical damage' and other potentially permanent injuries — or at least to abating pain that is 'severe.'" *Id.* at 1265.[34]

---

[33] *Teneyck v. United* States, No. 12-CF-939, 2015 D.C. App. LEXIS 104, at *7 (D.C. Apr. 2, 2015) (considering whether the evidence was sufficient to prove significant bodily injury and explaining that the focus must be on "whether a medical professional was required to remove the glass [from the victim's hand] because [the victim] could not have safely removed it himself – for example, with tweezers or another self-administered remedy").

[34] *See also Nero v. United States*, 73 A.3d 153, 158-59 (D.C. 2013) (holding that "wounds created by a bullet are not *per se* significant bodily injuries" and

(continued…)

We distinguished "hospitalization," which we called "the alternative basis for finding 'significant' bodily injury," observing that it may be entailed in "fluid situations," involving "immediate then prolonged monitoring, coupled with testing," that may (or may not) "eventuate in treatment." *Id.* at 1264 n.18.

In the instant case, C.H. testified that during the attack — which she told hospital personnel happened at about 10:30 p.m. — her assailant "kept banging [her] head against the ground," causing her to have "ringing" in her head and to feel "very disoriented" and causing her head to "hurt extremely." After the attack, she "got up and . . . just ran [a block and a half] towards [her] house." One of her housemates called 911, and police and an ambulance arrived. The ambulance took her to a hospital emergency room, where she arrived after midnight and remained "over night"; she was "released the next morning." Dr. Smith testified that when C.H. arrived at the hospital shortly after midnight, her heart rate was slightly elevated and "she complained of a severe headache, neck pain and jaw pain where she said she was hit." Dr. Smith saw "multiple abrasions . . . all over [C.H.'s]

---

(…continued)
concluding that there was no significant bodily injury where "[t]he only medical treatment" received by one victim, who had been shot or grazed in the shoulder but did not even realize it at the time, was "diagnostic tests, pain medication, and wound care" and where the treating physician testified that if the victim had not been treated, "probably not much" would have happened).

body," including her face, around her eye, her neck, all four extremities, her feet and wrist, her back and shoulders, her abdomen, her buttocks, and her inner thighs, and "soft tissue swelling and bruising to her face and around her eye."[35] Noting that C.H. had "evidence of trauma around her eyes" and "a lot of jaw tenderness," and "concerned" that she had a "significant head injury," Dr. Smith ordered CAT scans of her head, face and mandible as well as an X-ray of her neck to rule out bone injury. He found no evidence of any "bony fractures of the extremities" but just "scratches, abrasions, [and] bruising." C.H. testified that she was "given medicine for the pain in [her] head," but neither Dr. Smith nor C.H. testified about whether the medication ordered for C.H.'s pain was prescription-strength.

Whether the government proved, on this evidence, that C.H. suffered significant bodily injury might be less than obvious. C.H. was able to run to her home after the attack. At the hospital, she underwent professional diagnostic screening — CAT scans and an X-ray — but, as in *Quintanilla*, no evidence was presented that she received professional treatment to avert additional harm or prescription medication for her pain. And, although she was taken to the hospital, her overnight stay appears to have been the result, at least in part, of how long the

---

[35] Officer Koenig and Detective Spriggs also observed "injuries" or "multiple lacerations" to C.H.'s face.

testing and evidence collection took rather than necessarily an indicator that she required inpatient hospital care for her injuries.[36]

Nevertheless, we have previously noted that there is a continuing "question as to where the line [should be] drawn between monitoring or testing and treatment in . . . fluid situations" such as one involving "a head injury that may or may not have resulted in a concussion," "where no 'treatment' is ultimately necessary to preserve or improve the victim's health." *Quintanilla*, 62 A.3d at 1264 n.18. In addition, in considering the injury threshold for "significant bodily injury," we are mindful that during the Council of the District of Columbia hearing on the legislation that established the offense of felony assault, the Attorney General of the District of Columbia endorsed the legislation as responding to "the need for an intermediary felony assault to cover the 'many assault cases involv[ing] a victim who has been seriously beaten, sometimes leaving the victim with black eyes, lacerations, broken bones, or serious bruising *all over the body*.'" *R.S.*, 6 A.3d at 858 (emphasis added) (quoting *Public Health Hearing on B13-247: The Omnibus Public Safety Act of 2005*, 16th Sess. (D.C. 2005), at 15 (statement of Robert J.

---

[36] *See Teneyck*, 2015 D.C. App. LEXIS 104, at *7 n.4 (explaining that "'hospitalization' under the statute requires more than being admitted for outpatient care").

Spagnoletti, Attorney General) [hereinafter Spagnoletti Testimony]). As understood by the Attorney General, the bill creating the offense of felony assault would cover assaults "that are more egregious than a simple assault[.]" Spagnoletti Testimony at 16. Both of our first two opinions discussed above, dealing with the definition of significant bodily injury," quoted this language from the Attorney General. *R.S.*, 6 A.3d at 858; *Quintanilla*, 62 A.3d at 1264.

As with every challenge to the sufficiency of evidence, we must view the evidence in the light most favorable to the government and reverse only where the government has "failed to provide evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt." *Nero*, 73 A.3d at 157 (internal quotations omitted). While not every blow to the head in the course of an assault necessarily constitutes significant bodily injury, *see Quintanilla*, 62 A.3d at 1262, we conclude that where, as here, the defendant repeatedly struck the victim's head, requiring testing or monitoring to diagnose possible internal head injuries, and also caused injuries all over the victim's body, the assault is sufficiently egregious to constitute significant bodily injury. Because the testimony and photographic evidence in this case showed that appellant "kept banging [C.H.'s] head against the ground" with the result that she felt disoriented; that the hospital emergency room physician ordered a CAT scan and X-ray of her head and neck to determine

whether she sustained internal injuries; and that C.H. sustained multiple abrasions and bruising all over her body, including trauma around her eye, we hold that the evidence was sufficient to allow a reasonable jury to conclude beyond a reasonable doubt that C.H.'s injuries were significant and thus to support appellant's conviction of felony assault. *See Nero*, 73 A.3d at 159.

## V.     Conclusion

For the foregoing reasons, appellant's convictions are

*Affirmed.*